**UNITED STATES of America, Plaintiff,**

v.

**PRINCE HALL VILLAGE, INC:, Defendant.**

**No. 83–4048.**

United States District Court, C.D.Illinois, Peoria Division.

Oct. 19, 1984.

Mark D. Stuaan, Asst. U.S. Atty., Peoria, Ill., for plaintiff; John Mahoney, U.S. Dept. of HUD, Chicago, Ill., of counsel.

Clarence J. Crooks, Chicago, Ill., for defendant.

## ORDER

MIHM, District Judge.

The United States filed this foreclosure suit alleging that it was the holder of the note, mortgage and security agreement for the Riverview Apartments, that the loan was in default, and that the United States was entitled to a decree foreclosing its lien and an order requiring judicial sale of its property. On July 15, 1983, two days after the filing of the complaint, the Government was placed in possession of the subject premises and has remained in possession. Currently pending before the Court are the parties' cross-motions for summary judgment.

## FACTUAL BACKGROUND

The following facts are uncontested: On August 6, 1970, Prince Hall Village, Inc. ("Prince Hall") executed and delivered to Northwest Bank and Trust Company a mortgage note in the amount of $2,288,200 securing the same by a mortgage encumbering certain realty in Rock Island County. The note provided for payment of monthly installments and authorized the holder to accelerate the maturity if any installment remained unpaid on the due date of the next installment. The mortgage was duly recorded in the Office of the Recorder of Deeds of Rock Island County. On January 26, 1970, to further secure payment of the note, Prince Hall executed and delivered to Northwest Bank and Trust Company a security agreement covering certain chattels, located or to be located on the realty described in the mortgage.

Paragraph nineteen of the mortgage provides for acceleration and immediate right to foreclosure upon default. Paragraph five of the mortgage note contains a substantially identical provision.

Executed contemporaneously with the mortgage note and mortgage was a Regulatory Agreement. That agreement was also recorded in the Office of the Recorder of Deeds. The Regulatory Agreement gave the Department of Housing and Urban Development (HUD) the right to limit the rents charged by Prince Hall. Prince Hall requested rent increases in 1978, 1980 and 1982, all of which were approved by HUD.

The Secretary of HUD is now the lawful owner and holder of the note and mortgage by virtue of assignments recorded in the Office of the Recorder of Deeds. It is also the lawful owner and holder of the security agreement by virtue of an unrecorded assignment and the filing of UCC notices of assignment. Under the terms of the mortgage, default entitles the mortgagee to the appointment of a receiver, to possession of the premises and to all profits and income.

The Government alleges that Prince Hall did not pay the installment due September 1, 1971 prior to the due date of the next monthly installment and has made no subsequent payment sufficient to restore the loan to currency. As of December 1, 1983, the accelerated debt was almost $3,000,000. Prince Hall contends that HUD prevented or would not allow it to charge sufficient rents in order to generate sufficient income so that Prince Hall could meet its project financial obligations, and thus, Prince Hall has a valid defense to the foreclosure action.

Prince Hall argues that the prevention doctrine constitutes a valid defense to the action on the debt, and therefore it can be raised in a foreclosure action upon which the debt is predicated. The prevention doctrine, Defendant submits, states that each party to a contract implicitly agrees not to prevent the other party from performing, and failure to perform any contract according to its terms is excused when such performance is prevented by the acts of the opposite party, especially where one party has, by its acts or conduct, made performance by the other party impossible. Prince Hall argues that HUD, pursuant to the authority granted to it in the Regulatory Agreement, has made performance by Prince Hall impossible since HUD did not allow Prince Hall to charge adequate rents in order to generate sufficient income to pay the obligations owed by it to HUD under the note and mortgage. Defendant contends that HUD's policy gave undue weight and consideration to the ability of tenants to pay such rent increases and that HUD's denial of legitimate rent increases which would have allowed Prince Hall to meet its contractual obligations can be construed as arbitrary and capricious conduct.

■ In *United States v. Winthrop Towers*, 628 F.2d 1028 (7th Cir.1980), the Seventh Circuit articulated the standard by which the Secretary of HUD's actions in foreclosure of a federally insured mortgage are gauged, and identified the procedures to be followed in district court. In exercising its discretion, HUD may decide to foreclose in order to minimize losses from its insurance fund and may also consider other factors relevant to national housing policy. 628 F.2d at 1036. Judicial review of HUD's action is limited to the question of HUD's compliance with the "arbitrary and capricious" standard of the Administrative Procedures Act. That "very limited review" does not entail a de novo review of the merits of HUD's decision or compel HUD to initially file proof of procedural regularity, but requires the mortgagor resisting foreclosure to introduce "some evidence of HUD's arbitrary or capricious action, abuse of discretion or failure to comply with applicable law." 628 F.2d at 1036. Given HUD's broad discretion, *Winthrop Towers* noted that summary judgment motions would frequently be the appropriate mechanism for determining whether there is any substance to the mortgagor's claims. 628 F.2d at 1036.

■ HUD decisions regarding rent increases are committed to agency discretion by law. *Hahn v. Gottlieb*, 430 F.2d 1243 (1st Cir.1970). *Gottlieb* stated that there is an implied congressional intent to cut off review of such a decision above the agency level and that the courts are ill-equipped to superintend managerial decisions regarding rent increases. See also *Langevin v. Chenango Corp., Inc.*, 447 F.2d 296, 303 (2nd Cir.1971). The Seventh Circuit expressed its concurrence with these holdings in *Harlib v. Lynn*, 511 F.2d 51 (7th Cir. 1975). *Harlib* involved the issue of whether tenants of a project subsidized and insured under § 221(d)(3) of the National Housing Act were entitled to judicial review of HUD's decision to grant the mortgagor's request for a rental increase. The Seventh Circuit held that no right to a hearing could be found in the statutes and agreed with the First, Second, and Third Circuits that Congress did not intend such review. 511 F.2d at 55, 56. The court referenced, with approval, portions of the decision in *Hahn*, supra, and *Langevin*, supra.

■ The limited review which can be conducted by this Court under the *Win-*

*throp Towers* standard does not lead to the conclusion that HUD's actions were arbitrary and capricious. The above-cited authority makes it clear that the duties of the Secretary of HUD are discretionary in the area of rent increases. It is inappropriate to submit these decisions to judicial supervision. See also *Frakes v. Pierce*, 700 F.2d 501, 505 (9th Cir.1983); *Falzarano v. United States*, 607 F.2d 506, 513 (1st Cir.1979). The Defendant was aware at the time it executed the note and mortgage in 1970 that rents were to be kept at levels that low and moderate income tenants could afford. It expressly agreed to restrictions on rental charges when it executed the Regulatory Agreement.

■ Prince Hall's defense based on the prevention doctrine must also fail based on the rationale of *United States v. Sherman Gardens Co.*, 298 F.Supp. 1332 (D.Nev. 1967). *Sherman Gardens* held that the affirmative defenses of impossibility, prevention of performance and commercial frustration were unavailable to a defendant in an action brought by the government on a promissory note and for foreclosure of a trust deed on a housing project. The court stated that:

> "This was a simple loan transaction. The government did not guarantee a profitable operation or limit the source of the funds to be used to pay the loan (citations omitted) .... If a lender wishes to guarantee that a debtor will have the money to pay the debt when it falls due, we assume he could do so, but nothing but an express unequivocable undertaking to that effect would warrant such a conclusion." 298 F.Supp. at 1334.

Prince Hall also raises the affirmative defense that it was denied an operating subsidy. The Government replies that the Defendant is estopped from claiming a right to such a subsidy. The operating subsidy was authorized by Congress on August 22, 1974 in the 1974 Housing Act. Section 212 of that Act amended § 236(f) of the National Housing Act ("NHA"), 12 U.S.C. § 1701 et seq., by authorizing the Secretary of HUD to make operating subsidies available to project owners in order to cover increased utility costs and property taxes exceeding a predetermined operating expense level. Section 212 also amended § 236(g) of the NHA by authorizing the Secretary to use excess rentals collected from project owners for the payment of these operating subsidies. Pub.L. 93–383, 88 Stat. 633, 672. The subsidies were to be paid only to the extent there were tenants residing in the project who pay more than 25% of their income for rent (where rent includes utilities). See *Abrams v. HUD*, 547 F.2d 1062, 1066 (9th Cir.1976).

Subsequently, the Secretary declined to implement the operating subsidy program. Residents of HUD 236 projects brought suits across the United States and the courts uniformly found the operating subsidy program to be mandatory. In the light of these decisions, HUD entered into a settlement agreement (Exhibit A to Plaintiff's Memorandum in Support of Motion for Summary Judgment) under which approximately $60,000,000 was deposited with a district court for disbursement in accordance with paragraph 9 of the settlement agreement. Plaintiff argues that Prince Hall (Riverview Apartments) was not entitled to nor did it make a claim for the money in the settlement fund. As a project owner, Prince Hall was only eligible when it "ha(d) been enjoined from collecting a HUD-approved rent increase, or ha(d) agreed not to collect such an increase by reason of specific litigation brought on behalf of tenants ...." (paragraph 9(d) of the Settlement Agreement). Plaintiff submits that none of these preconditions are present in this case. On the other hand, a tenant who resided in Riverside Apartments between February 1, 1975 and September 30, 1977 and who paid in excess of 25% of his or her income for rent was eligible to share in the settlement funds.

Prince Hall rejects HUD's reliance on the settlement agreement reached in the cases brought by tenants of 236 projects and instead relies on *Battles Farm Company v. Harris*, 703 F.2d 1292 (D.C.Cir.1983), a suit initiated by owners of housing

projects. Defendant contends that *Battles Farm* mandates HUD implementation of the operating subsidy program and specifies the manner of determining the amount of operating subsidy to which a project owner may be entitled. Prince Hall argues that, at HUD's insistence and encouragement, it did not request rent increases during the period in which the operating subsidy was to apply. An operating subsidy coupled with a legitimate rent increase, Prince Hall argues, could have obviated Defendant's indebtedness to HUD.

 *Battles Farm* may theoretically entitle Prince Hall to an operating subsidy, but the facts do not show that Prince Hall is entitled to such relief. First, *Battles Farm* expressly rejected the project owners' claim to a long term contract for operating subsidies. 703 F.2d at 1297. Second, *Battles Farm* held that as long as the actual rent charged by the owners was less than the maximum basic rental they could have charged but greater than or equal to 30% of the tenant's income, the owners were entitled to retroactive subsidy payments for the difference between the amount of the subsidy received and the actual rent received from the tenants. 703 F.2d at 1295–96. In resisting Plaintiff's Motion for Summary Judgment, it is incumbent on the Defendant to make some showing that it meets the requirements which would entitle it to an operating subsidy. The Defendant has not attempted to show that it comes within the narrow category of owners entitled to an operating subsidy under the *Battles Farm* criteria.

Since Prince Hall has not made a showing that it fulfills the requirements for an operating subsidy, whether or not it sought that subsidy is immaterial. However, even if Prince Hall did meet the requirements, it is precluded from such relief because it did not apply for a subsidy when HUD's program was supposed to be in effect. Defendant's affidavit of Clarence Crooks states that the operating subsidy was asked for "(m)any times subsequent to April, 1983." The program, however, was eliminated in 1978. Defendant's memorandum states that Prince Hall did not request rent increases during the period in which the operating subsidy was to apply due to HUD's insistence and encouragement. There is no evidence in the record, however, to support that inference. Thus, this is not a situation where equitable estoppel could be applied.

Based on the foregoing, IT IS ORDERED:

1. Plaintiff's Motion for Summary Judgment is GRANTED.

2. Defendant's Motion for Summary Judgment is DENIED.

3. The matter will be set as soon as the Court's calendar allows for a hearing on the question of appropriate relief.