**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**OCCI COMPANY, a partnership,
Defendant-Appellant.**

No. 84–1590.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 29, 1985.
Decided March 28, 1985.

Stephen J. Liccione, Asst. U.S. Atty., Joseph P. Stadtmueller, U.S. Atty., Milwaukee, Wis., John H. Mahoney, Assoc. Regional Counsel, Chicago, Ill., for plaintiff-appellee.

Ralph A. Weber, Quarles & Brady, Milwaukee, Wis., for defendant-appellant.

Before CUDAHY, POSNER and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

The defendant, OCCI Company ("OCCI"), appeals from a final order of the district court granting summary judgment in favor of the government in its suit to foreclose on a federally insured mortgage which the Secretary of Housing and Urban Development ("HUD") held as assignee. We affirm.

On May 19, 1970, OCCI, a partnership originally consisting of several Milwaukee physicians and dentists, executed and delivered to First Wisconsin National Bank of Milwaukee a note in the amount of $3,194,-600 which was secured by a mortgage on a low and moderate income housing project, known as Apollo Village Apartments ("Apollo Village"), to be built in Milwaukee's inner city. OCCI, however, failed to pay the monthly installment due on December 1, 1973 prior to the due date of the next monthly installment as required under the terms of the mortgage note and was therefore in default. Since that time, OCCI has not made sufficient payments to restore its loan to currency.

Shortly after its acquisition of the note and mortgage by assignment,[1] HUD commenced negotiations with OCCI, through its managing partner, Dr. Louis Maxey, to remedy the serious physical deterioration of the Apollo Village project and to bring the mortgage payments current. Their efforts culminated in a March 13, 1975 Propositional Work-Out Arrangement which HUD officials drafted and submitted to OCCI. Although OCCI never signed this proposal nor entered into any other written work-out agreement, HUD nonetheless continued to work with OCCI in hopes of resolving the fiscal problems which plagued

---

1. On May 4, 1971, First Wisconsin assigned its interest to Prudential Insurance Company. The Secretary of HUD became the lawful owner and holder of the note and mortgage on the Apollo Village project by virtue of an assignment from Prudential recorded on November 20, 1974. Consequently, by the time HUD acquired the mortgage and note, OCCI had been in default for almost a year.

the Apollo Village project, at various times providing subsidies in the form of interest reduction payments, loan management funds and rent supplement funds. Apparently, little improvement occurred. So finally, troubled by Apollo Village's high vacancy rate and continued poor state of repair as well as the lack of investment by OCCI of additional funds to offset needed repairs, HUD, in December 1980, informed Dr. Maxey that OCCI's failure to make a financial contribution toward needed repairs would result in a recommendation for foreclosure. HUD agreed, however, to forestall any "adverse action" until April 30, 1981, by which time Dr. Maxey was expected to have made significant improvements in the physical condition of the Apollo Village project or negotiate its sale. In May, HUD notified Dr. Maxey that it had decided to foreclose, citing as its reasons OCCI's serious default on its loan (the delinquent balance as of March 1, 1981, totalled $365,852.15 which constituted an increase of over $100,000 during the previous twelve months), failure to propose a satisfactory work-out arrangement, poor financial reporting, and failure to provide sufficient capital funding to improve Apollo Village's overall poor physical condition. Representing to HUD that he was in the process of negotiating the sale of Apollo Village, Dr. Maxey, through counsel, informed HUD on May 15, 1981, that he expected to conclude negotiations shortly and would be able to present a proposal to HUD for its approval no later than the week of June 1, 1981, and requested that any foreclosure action be forestalled until such time. HUD complied. OCCI subsequently submitted a proposal to HUD on August 21, 1981, but it was deemed deficient. In its response, HUD additionally stated that further negotiations would be conditioned upon a "substantial up-front cash contribution to be applied against the existing delinquency" and the "resolution of the outstanding audit findings" to HUD's satisfaction. HUD, however, also agreed to a 30-day "hold" on the institution of foreclosure proceedings to enable OCCI to submit an amended proposal. None came. Consequently, the government commenced the instant foreclosure action on January 11, 1982.

On March 22, 1982, nearly two and one-half months after suit was filed, OCCI submitted its formal request for HUD approval of Apollo Village's sale ("Johnson/Schuman proposal"). During the ensuing four months, HUD officials processed the request, met and corresponded with the proposed purchaser and OCCI's counsel, finally rejecting the proposed sale on July 30, 1982. On October 13, 1982, the government moved for summary judgment. The district court concluded, among other things, that HUD did not abuse its discretion in disapproving OCCI's proposed sale of Apollo Village, and since OCCI admitted default, the court entered summary judgment for the United States on February 16, 1984. *United States v. OCCI Company,* 580 F.Supp. 645 (E.D.Wis.1984). OCCI now appeals.

■ It is undisputed that OCCI has been in default since December, 1973, on its obligation to make periodic payments on its mortgage note. Once a default is established, " 'the sole situation presented is one of remedies.' " *United States v. Victory Highway Village, Inc.,* 662 F.2d 488, 494 (8th Cir.1981), *quoting United States v. View Crest Garden Apartments, Inc.,* 268 F.2d 380, 383 (9th Cir.), *cert. denied,* 361 U.S. 884, 80 S.Ct. 156, 4 L.Ed.2d 120 (1959). While HUD must exercise its powers consistent with national housing policy as embodied in 42 U.S.C. § 1441, it has broad discretion to choose its remedies in the event of default and thereby achieve national housing objectives. *United States v. Victory Highway Village, Inc.,* 662 F.2d at 495; *United States v. Winthrop Towers,* 628 F.2d 1028, 1036 (7th Cir.1980). Section 107(k) of the National Housing Act, 12 U.S.C. § 1713(k), authorizes the Secretary to institute foreclosure proceedings and to prosecute such proceedings to conclusion in the event of default. In addition, the remedies provided by the terms of the mortgage contract expressly empower HUD, upon default, to enforce payment of sums due by judicial foreclosure. In the instant case,

HUD's decision to foreclose and institute judicial proceedings is not challenged by OCCI.[2] Rather, OCCI's challenge to the foreclosure proceedings centers on HUD's actions following the filing of suit in district court. OCCI complains that HUD's handling and ultimate rejection of OCCI's request for approval of the Johnson/Schuman proposal was improper, thereby precluding HUD from *continuing* to prosecute the foreclosure action.

Once the right to foreclose has been established, as is the case here, this court has allowed the mortgagor to come forward and introduce, as an affirmative defense which would defeat HUD's foreclosure right, evidence that HUD's decision to foreclose was " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *United States v. Winthrop Towers*, 628 F.2d at 1036 (citation omitted). *Accord United States v. Victory Highway Village, Inc.*, 662 F.2d at 494; *United States v. Prince Hall Village, Inc.*, 597 F.Supp. 118, 120 (C.D.Ill.1984); *United States v. American National Bank & Trust Company of Chicago*, 595 F.Supp. 324, 325 (N.D.Ill.1983); *United States v. Beacon Terrace Mutual Homes, Inc.*, 594 F.Supp. 53, 57 (D.Md.1984); *Little Earth of United Tribes, Inc. v. U.S. Department of HUD*, 584 F.Supp. 1287, 1290 (D.Minn. 1983). OCCI seeks to extend the holding of *Winthrop Towers* and require judicial review of the actions of HUD occurring subsequent to its decision to foreclose and the institution of foreclosure proceedings. OCCI asserts that summary judgment cannot be granted because there is a genuine issue of fact concerning HUD's conduct, during the course of litigation, in rejecting the attempts of OCCI to save the Apollo Village project. Specifically, OCCI contends that the evidence it has marshalled suggests that HUD (1) acted arbitrarily and capriciously, (2) failed to consider and comply with the mandate of the National Housing Act, 42 U.S.C. § 1441, and (3) violated its own privacy regulations, 24 C.F.R. § 16.11, in its disapproval of the Johnson/Schuman proposal, thereby precluding HUD's right to continue the prosecution of its foreclosure action.

There is little doubt that HUD, in its dealings with defaulting mortgagors, is obliged to follow the mandates and policies of the National Housing Act, *see, e.g., United States v. Winthrop Towers*, 628 F.2d at 1035, and " '[a]ction taken without consideration of them, or in conflict with them, will not stand.' " *Id.* (citation omitted). One of the objectives of the national housing policy, as pointed out by OCCI, is that "private enterprise shall be encouraged to serve as large a part of the total need as it can. . . ." 42 U.S.C. § 1441. However, once a mortgagor defaults, " '[t]he federal policy to protect the treasury and promote the security of federal investment which in turn promotes the prime purpose of the Act—to facilitate the building of homes by use of federal credit—becomes predominant.' " *United States v. Victory Highway Village, Inc.*, 662 F.2d at 494, *quoting United States v. Stadium Apts., Inc.*, 425 F.2d 358, 363 (9th Cir.), *cert. denied*, 400 U.S. 926, 91 S.Ct. 187, 27 L.Ed.2d 926 (1970). In the present case, it is clear that HUD's decision to reject the Johnson/Schuman proposal served to promote the interests and objectives of the National Housing Act. Among the reasons set forth by HUD's Acting Area Manager in a letter to OCCI's attor-

**2.** In its answer to the complaint, it is noteworthy that OCCI raises no defense as to HUD's initial determination to proceed with foreclosure proceedings nor challenges any of the reasons HUD set out in reaching its decision. *See* Letter of May 5, 1981, from Richard Franco, HUD Area Manager, to Dr. Maxey which states in part:

We have recommended foreclosure on the [Apollo Village] mortgage loan for the following reasons:

1. The project is in serious default and you have failed to provide our office with a satisfactory workout arrangement to bring the project current.

2. You have not taken satisfactory steps to improve the physical condition of the project.

3. You have never provided complete, audited annual financial statements for the project.

ney explaining HUD's rationale for its disapproval of the Johnson/Schuman proposal, and certainly the most prominent, was the inadequacy of cash contributions to remedy Apollo Village's physical deterioration and the outstanding mortgage delinquency. However, the letter went on to list other unacceptable terms of the proposal, including the use of a residual receipts note to finance the sale which would obligate Apollo Village to pay OCCI's equity. Additionally, the letter further explains that due to HUD's inability to secure loan management and flexible subsidy funding, a vital contingency of the proposal was not met. Coupled with OCCI's undisputed and longstanding default on its mortgage, there is little doubt but that the various reasons advanced by HUD in support of its decision to reject the proposed sale of Apollo Village are consistent with the intent and purpose of national housing policies and objectives.

In support of its claim, OCCI submits the affidavit of Dr. Maxey wherein he states that a purchase and sale agreement was developed and submitted to HUD for its approval but was rejected in an untimely fashion and without explanation as to the conditions on which the sale would be approved. Admittedly, Dr. Maxey's assertions are supportive of OCCI's argument that HUD acted arbitrarily or capriciously. However, the evidence does not support these conclusory statements. OCCI submitted the Johnson/Schuman proposal on March 23, 1982. On May 26, 1982, HUD corresponded with the prospective buyers and set out the deficiencies in the proposal, a copy of which was provided to Dr. Maxey. In response, OCCI's counsel wrote to HUD assuring it that the required information would be submitted; no inquiry was made concerning the specificity of HUD's problems with the proposal. On July 2, 1982, HUD again wrote to the prospective buyers and listed various items of the proposal which still had not been satisfactorily addressed. As before, Dr. Maxey was sent a copy of this correspondence. HUD's final decision disapproving the Johnson/Schuman proposal, and a listing of the reasons upon which it was based, was sent to OCCI's counsel on July 30, 1982, approximately four months after submission of the proposal. In the face of this sequence of events, the Maxey affidavit, replete with only conclusory statements, is clearly inadequate to support OCCI's allegation that HUD acted arbitrarily or capriciously in its handling of, and decision on, the Johnson/Schuman proposal and thereby defeat the government's summary judgment motion. *See United States v. Gross Realty & Construction Co.*, 586 F.Supp. 231, 235 (E.D.Pa.1984); *United States v. Golden Acres, Inc.*, 520 F.Supp. 1073, 1079 (D.Del. 1981).[3] Indeed, contracts requiring governmental approval and compliance with various statutory or regulatory provisions, by their very nature, may involve a lengthy review process. HUD's review and processing of the sale proposal was reasonably prompt, and its decision to deny the proposed sale was not arbitrary, capricious or contrary to national housing policy.

 Moreover, even if, as OCCI argues, HUD's approach in its review and disapproval of the Johnson/Schuman proposal was "ostrich-like" in light of the history of the Apollo Village project, and arguably created a factual dispute, it is not a material one.[4] The exercise of HUD's busi-

---

3. Dr. Maxey's bald assertion that HUD's delay in processing the Johnson/Schuman proposal foreclosed OCCI from entering into another purchase agreement with other "prospective purchasers" is similarly inadequate due to the failure of providing "specific facts" as required by Rule 56(e), Fed.R.Civ.P.

4. Equally immaterial to the resolution of the instant foreclosure action is OCCI's assertion that, in hindsight, the Johnson/Schuman proposal was the better alternative. In support of

its assertion, OCCI insists that HUD's management of the Apollo Village project during the instant litigation has not been particularly adept and has resulted in the expenditure of hundreds of thousands of tax dollars for maintenance and repairs, while asserting that the Johnson/Schuman proposal would have offered, over time, a full return on all HUD's dollars together with management by a private developer who already manages or owns more than 2,000 HUD units across the country and has a reputation

ness and administrative judgment in arriving at a decision to foreclose and institute proceedings is clearly circumscribed by its duty to promote the policies of the National Housing Act and subject to limited judicial review pursuant to 5 U.S.C. § 706(2)(A) of the Administrative Procedure Act. *United States v. Winthrop Towers*, 628 F.2d at 1036. However, once proceedings are commenced, any further business judgments made by HUD in its continued prosecution of the foreclosure action are immaterial and collateral to HUD's decision to foreclose and, therefore, wholly discretionary.[5] The availability of judicial review of HUD's discretionary decisions was not meant to afford the defaulting mortgagor an opportunity to resist foreclosure by seeking review of the efforts taken by the parties during the course of litigation in attempting to cure the default and resolve related fiscal problems and thereby prolong the foreclosure proceedings. Equitable grounds, as those asserted here by OCCI, are not a defense to mortgage foreclosure by HUD once default occurs, *Little Earth of United Tribes, Inc. v. U.S. Department of HUD*, 584 F.Supp. at 1291, especially in view that the negotiations for the sale of Apollo Village occurred subsequent to the commencement of foreclosure proceedings.[6]

■ Lastly, OCCI argues there exists a genuine issue as to whether HUD privacy regulations were violated. *See* 24 C.F.R. § 16.11. We need not address the merits of this assertion, however, since the Privacy Act, 5 U.S.C. § 552a, furnishes OCCI with the appropriate remedy for violations caused by action of a federal agency. *See* 5 U.S.C. § 552a(g)(1). Moreover, review of OCCI's Privacy Act claim is clearly collateral to the instant litigation and, therefore, to allow OCCI to litigate this claim in the context of a foreclosure proceeding would frustrate the objectives sought by HUD in its decision to foreclose—"the *prompt* enforcement of the rights of the United States through HUD" to minimize losses from its insurance funds, preserve the assets of the insurance fund so that more projects may be insured in the future, and protect public money from unnecessary risk. *United States v. Victory Highway Village, Inc.*, 662 F.2d at 495 (emphasis added). *See also United States v. Winthrop Towers*, 542 F.Supp. 1042, 1044 (N.D. Ill.1982).[7]

---

for turning around troubled projects like Apollo Village. Good management, however, is not enough to make foreclosure inappropriate if a sizeable delinquency is accumulating. *United States v. American National Bank & Trust Company of Chicago*, 595 F.Supp. 324, 325 (N.D.Ill. 1983).

5. Indeed, the government's power to settle cases in litigation is plenary and rarely limited by statute. *See generally*, Steadman, Schwartz & Jacoby, *Litigation with the Federal Government* §§ 2.101–.121 (1983). We hasten to add, however, that a district court judge has considerable supervisory powers thereby assuring that HUD foreclosure proceedings will be conducted in an appropriate manner.

6. Moreover, since HUD's processing of, and decision upon, the Johnson/Schuman proposal can be broadly described as efforts to reach and secure a settlement with OCCI on the foreclosure action, the admissibility of such facts is questionable. Rule 408, Fed.R.Evid., states, in part:

Evidence of (1) furnishing or offering, or promising to furnish ... a valuable considera-

tion in compromising or attempting to compromise a claim which was disputed as to ... validity, is not admissible to prove ... invalidity of the claim.... Evidence of conduct or statements made in compromise negotiations is likewise not admissible....

The facts OCCI offers in support of its affirmative defense and in opposition to summary judgment directly concern the validity of HUD's claim (i.e., its right to foreclose) and as such may be inadmissible in evidence, Fed.R.Evid. 408, and, if so, cannot support or oppose a motion for summary judgment. Fed.R.Civ.P. 56(e).

7. Additionally, we note that OCCI's Privacy Act claim may have been waived. The district court did not address this claim in its opinion. 580 F.Supp. 645. Although the government does not raise it as a concern in its brief, we find nothing in the record on appeal which indicates that OCCI raised a Privacy Act claim before the district court. Therefore, as best as we can determine, OCCI is advancing this claim for the first time on appeal and thereby precluding this court's review. *See American National Bank and Trust Co. of Chicago v. Bailey*, 750 F.2d 577, 585 (7th Cir.1984).

Accordingly, the district court's grant of summary judgment in favor of the United States is AFFIRMED.

POSNER, Circuit Judge, concurring.

I join Judge Flaum's opinion without reservations, and write separately only to indicate my doubts concerning the soundness of *United States v. Winthrop Towers*, 628 F.2d 1028, 1034–35 (7th Cir.1980), which held that a mortgagor can set up, as an affirmative defense to foreclosure by the Department of Housing and Urban Development, the Department's failure to comply with the statement of national housing objectives in 42 U.S.C. § 1441. This holding was followed in *United States v. Victory Highway Village, Inc.*, 662 F.2d 488, 494 (8th Cir.1981), but without discussion; I can find no other appellate case on the question.

Section 1441 provides as follows (I cannot make my point without setting forth the statute in full, lengthy as it is):

The Congress declares that the general welfare and security of the Nation and the health and living standards of its people require housing production and related community development sufficient to remedy the serious housing shortage, the elimination of substandard and other inadequate housing through the clearance of slums and blighted areas, and the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family, thus contributing to the development and redevelopment of communities and to the advancement of the growth, wealth, and security of the Nation. The Congress further declares that such production is necessary to enable the housing industry to make its full contribution toward an economy of maximum employment, production, and purchasing power. The policy to be followed in attaining the national housing objective established shall be: (1) private enterprise shall be encouraged to serve as large a part of the total need as it can; (2) governmental assistance shall be utilized where feasible to enable private enterprise to serve more of the total need; (3) appropriate local public bodies shall be encouraged and assisted to undertake positive programs of encouraging and assisting the development of well-planned, integrated residential neighborhoods, the development and redevelopment of communities, and the production, at lower costs, of housing of sound standards of design, construction, livability, and size for adequate family life; (4) governmental assistance to eliminate substandard and other inadequate housing though the clearance of slums and blighted areas, to facilitate community development and redevelopment, and to provide adequate housing for urban and rural nonfarm families with incomes so low that they are not being decently housed in new or existing housing shall be extended to those localities which estimate their own needs and demonstrate that these needs are not being met through reliance solely upon private enterprise, and without such aid; and (5) governmental assistance for decent, safe, and sanitary farm dwellings and related facilities shall be extended where the farm owner demonstrates that he lacks sufficient resources to provide such housing on his own account and is unable to secure necessary credit for such housing from other sources on terms and conditions which he could reasonably be expected to fulfill. The Department of Housing and Urban Development, and any other departments or agencies of the Federal Government having powers, functions, or duties with respect to housing, shall exercise their powers, functions, and duties under this or any other law, consistently with the national housing policy declared by this Act and in such manner as will facilitate sustained progress in attaining the national housing objective hereby established, and in such manner as will encourage and assist (1) the production of housing of sound standards of design, construction, livability, and size for adequate family life; (2) the reduction of the costs of housing without sacrifice of such sound standards; (3) the use of new designs, materials, techniques, and methods in residential construction, the use of

standardized dimensions and methods of assembly of home-building materials and equipment, and the increase of efficiency in residential construction and maintenance; (4) the development of well-planned, integrated, residential neighborhoods and the development and redevelopment of communities; and (5) the stabilization of the housing industry at a high annual volume of residential construction.

In this protracted recital of hopes and homilies, one finds few specifics (except about farms), and none that bear on foreclosure or could provide any guidance for a court called on to review a decision to foreclose. I think Congress would be surprised and dismayed to discover that by trying to give guidance of the most general sort—inspiration would be a better word—to HUD, it had made it harder for HUD to foreclose on delinquent mortgages, by giving mortgagors an argument with which to delay and very occasionally defeat foreclosure or at least make the process of foreclosure more costly. This is not to say, of course, that a HUD mortgagor should have no defenses in foreclosure actions; he should and does; but I do not think that one of them is that HUD violated section 1441 by instituting foreclosure proceedings when it did rather than giving him more time.

The court in *Winthrop Towers* emphasized the "very broad discretion" that section 1441 allows HUD—"the highly discretionary nature of the decisions HUD must make in the course of administering loans," 628 F.2d at 1036, but drew back from concluding that the agency's exercise of discretion was unreviewable. I would have taken the additional step. I do not know what constructive contribution this or any other court can make to the achievement of the nation's housing goals by reviewing HUD's decision to foreclose for conformity with the generalities of section 1441. There is no definite standard for a reviewing court to apply, and, given the lack of such a standard, little likelihood that a responsible reviewing court will ever invalidate, under section 1441, a decision to foreclose. All that judicial review can do in this setting is delay foreclosure and thereby complicate HUD's already daunting mission. If ever there was a case where judicial review was unavailable because "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2), which is an exception to the presumption of judicial reviewability designed precisely for cases where "statutes are drawn in such broad terms that in a given case there is no law to apply," S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971), this is the case.

An unbroken line of cases holds that decisions by federal housing authorities to raise (or authorize the raising of) rents for publicly owned or assisted housing are not reviewable for conformity with the aspirations of the National Housing Act, and notes among other things the delays that judicial review would create. See, e.g., *Frakes v. Pierce,* 700 F.2d 501, 503–06 (9th Cir.1983); *Falzarano v. United States,* 607 F.2d 506, 512–13 (1st Cir.1979); *Langevin v. Chenango Court, Inc.,* 447 F.2d 296, 302–04 (2d Cir.1971) (Friendly, C.J.); *Hahn v. Gottlieb,* 430 F.2d 1243, 1249–51 (1st Cir.1970). The decision to foreclose on a commercial mortgage rather than give the mortgagor more time, like the decision how much rent to charge for an apartment, is a managerial and business rather than legal judgment. It has to be made and implemented quickly in order to be effective, and courts can do little to improve it—especially when evaluating it under as formless a mandate as section 1441, a statute that does not refer to foreclosure and, as far as I can see, is not relevant to it.