UNITED STATES of America,
Plaintiff-Appellee,

v.

PRINCE HALL VILLAGE, INC.,
Defendant-Appellant.

No. 85–1638.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 9, 1986.

Decided April 29, 1986.

As Amended on Denial of Rehearing and Rehearing En Banc June 24, 1986.

---

**598**

Clarence J. Crooks, Clarence J. Crooks, Chicago, Ill., for defendant-appellant.

John H. Mahoney, Associate Regional Counsel, H.U.D., Chicago, Ill., for plaintiff-appellee.

Before CUDAHY and COFFEY, Circuit Judges and ESCHBACH, Senior Circuit Judge.

CUDAHY, Circuit Judge.

Defendant-appellant Prince Hall Village, Inc. ("Prince Hall") defaulted on its federally-insured mortgage. Under the terms of the mortgage and a contemporaneously negotiated agreement between Prince Hall and the United States Department of Housing and Urban Development ("HUD"), HUD could accelerate the debt in the case of default and could foreclose were the debt not paid. After Prince Hall remained in default for 12 years, HUD moved for foreclosure and was granted summary judgment by the United States District Court for the Central District of Illinois, 597 F.Supp. 118. Prince Hall appeals that decision, alleging that HUD's behavior was arbitrary and capricious. We affirm.

In 1970, Prince Hall borrowed $2,288,200 from the Northwest Bank and Trust Company ("Northwest") in order to build a 152-unit apartment complex, the Riverview Apartments, in Rock Island, Illinois. Prince Hall executed in favor of Northwest both a mortgage and a mortgage note to secure the property. The complex was designed to serve lower-income families and Prince Hall elected to participate in the National Housing Act's § 236 program. Under this program, HUD agreed to guarantee Prince Hall's repayment of the mortgage and to subsidize the repayment of interest. In return, Prince Hall signed a "Regulatory Agreement" which allowed HUD to establish the maximum rent for the apartments. Tenants were to be charged that rent or 30% of their income, whichever was greater.

Prince Hall's mortgage contained a clause providing for acceleration upon default:

19. In the event of default in making any monthly payment provided for herein or in the note secured hereby for a period of thirty (30) days after the due date thereof, or in the case of a breach of any other covenant or agreement herein stipulated, then the whole of said principal sum remaining unpaid together with accrued interest thereon, shall, at the election of the Mortgagee, without notice, become immediately due and payable, in which event the Mortgagee shall have the right immediately to foreclose this mortgage.

The mortgage note included a similar default provision.

The regulatory agreement between Prince Hall and HUD also contained a section regarding default:

12. Upon a violation of any of the above provisions of this Agreement by Owners, the [Secretary] may give written notice, thereof, to Owners.... If such violation is not corrected to the satisfaction of the [Secretary] within thirty (30) days after the date such notice is mailed or within such further time as the [Secretary] determines is necessary to correct the violation, without further notice the [Secretary] may declare a default under this Agreement effec-

tive on the date of declaration of default and upon such default the [Secretary] may:

(a)(1) If the [Secretary] holds the note—declare the whole of said indebtedness immediately [due] and payable and then proceed with the foreclosure of the mortgage.

Prince Hall defaulted in September 1971. At that time, the then-mortgage holder, the Federal National Mortgage Association ("FNMA"), assigned HUD the mortgage, note and other instruments pertaining to the property. HUD was obligated to pay FNMA more than $2 million that was owed on the mortgage. At the time of Prince Hall's default, HUD chose not to exercise its option to accelerate payment. Rather, it allowed Prince Hall time to make the loan current. HUD waited 12 years before beginning foreclosure proceedings in 1983.

In defense against foreclosure, Prince Hall argued that it had been denied adequate rent increases. HUD had granted Prince Hall rent increases in 1978, 1980 and 1982 but Prince Hall contended these were less than what was necessary to cover operating expenses. This failure to grant adequate increases, Prince Hall claimed, prevented it from fulfilling its mortgage obligations.

As a second affirmative defense, Prince Hall stated that HUD's failure to provide it an operating subsidy resulted in its inability to cure its default. The operating subsidy program existed between 1975 and 1978 and was designed to benefit tenants by using federal funds to pay for any rent increases extended to low-income landlords. The United States argued in response that Prince Hall defaulted before the operating subsidy program was in existence and never showed that it was entitled to such a subsidy.

The district court found for the United States. Relying on this court's earlier decision in *United States v. Winthrop Towers*, 628 F.2d 1028 (7th Cir.1980), the court said,

In exercising its discretion, HUD may decide to foreclose in order to minimize losses from its insurance fund and may also consider other factors relevant to National Housing Policy. Judicial review of HUD's action is limited to the question of HUD's compliance with the 'arbitrary and capricious' standard of the [Administrative Procedure Act].

Applying the arbitrary and capricious standard, the court found HUD's actions reasonable and within agency discretion. We agree.

## I.

In *United States v. Winthrop Towers,* this court held that HUD has very broad discretion to determine when to foreclose following a default. *Winthrop Towers,* although it involved different defenses to foreclosure, is factually similar to the case before us. There, HUD sought to foreclose on a federally-insured mortgage for a low income housing project because the mortgage loan was in default. As in the present case, when default first occurred, HUD was assigned the mortgage and allowed the developer time to repay. Only when this workout arrangement failed to correct the default, did HUD initiate foreclosure proceedings. In detailing "the highly discretionary nature" of HUD's foreclosure power, this court concluded that "the decision to foreclose a mortgage is fundamentally of a business and administrative nature, requiring the exercise of HUD's business and administrative judgment." 628 F.2d at 1036.

The principle of *Winthrop Towers* was reaffirmed in *United States v. OCCI Co.,* 758 F.2d 1160 (7th Cir.1985). There again HUD took over as assignee on a federally-insured mortgage after defendant's default. Again, only after a series of second chances failed to rectify the default, did HUD foreclose. In upholding this action, the court reiterated that "[HUD] has broad discretion to choose its remedies in the event of default and thereby achieve national housing objectives." *Id.* at 1162. Some of these objectives were detailed by the Eighth Circuit in *United States v. Victory Highway Village, Inc.,* 662 F.2d 488,

495 (8th Cir.1981), a decision upholding foreclosure:

> HUD's decision to foreclose is properly supported by considerations of minimizing losses from its insurance fund, preserving the assets of its insurance fund so that more projects may be insured in the future, and protecting public money from unnecessary risk.

In finding for HUD, the *Victory Highway* court also noted the "importance of the enforcement of the terms of the mortgage." *Id.* See also, *United States v. OCCI*, 758 F.2d at 1162. Here, the mortgage, the mortgage note, and the regulatory agreement all contain provisions allowing HUD to take possession and foreclose in the event of a default. Defendant's default occurred in 1971. HUD could have accelerated the debt at that time but chose to allow Prince Hall additional time to cure its shortfalls. HUD waited 12 years before seeking foreclosure. By 1983, Prince Hall's debt was over $3 million. HUD could not be expected to keep this sum at risk indefinitely.

## II.

█ However, while broad, HUD's foreclosure power is certainly not unlimited. The courts must play a narrow but significant role in reviewing foreclosure actions. But it is only when a foreclosure action is arbitrary or capricious or when there is an abuse of discretion that the courts will declare it invalid. The mortgagor resisting foreclosure bears the initial burden of introducing evidence showing arbitrary and capricious action. *Winthrop Towers*, 628 F.2d at 1036.

In this case, Prince Hall's contention that HUD's actions were arbitrary and capricious is almost wholly unsupported. Although HUD granted Prince Hall three separate rent increases, Prince Hall contends these were inadequate to meet its expenses and prevented it from honoring its mortgage obligations. Prince Hall states that had HUD granted the rent increases requested it could have met its operating costs. It does not indicate the amounts of the rent increases which were denied or illustrate how these denials caused Prince Hall's initial or continuing default. But even had Prince Hall offered some quantum of proof to support its allegations, the mere denial of a rent increase does not constitute arbitrary and capricious conduct. In fact, here Prince Hall entered into the development project knowing that HUD would have that power. To conclude that HUD has to provide every rent increase sought by a developer would render the regulatory agreement a nullity. Moreover, courts are decidedly inexpert at calculating what rents are appropriate. A long line of cases reserves these to agency discretion. *See United States v. Beacon Terrace Mutual Homes, Inc.,* 594 F.Supp. 53, 59 (D.Md.1984) ("failure to approve rent increases would [not] defeat HUD's right to foreclose this mortgage"); *cf. Harlib v. Lynn*, 511 F.2d 51, 56 (7th Cir.1975) (tenants may not seek judicial review of rent increases); *Hahn v. Gottlieb*, 430 F.2d 1243, 1251 (1st Cir.1970) ("the approval of rents and charges is a 'matter committed to agency discretion by law' and not subject to judicial review"); *Langevin v. Chenango Court, Inc.*, 447 F.2d 296, 303 (2d Cir. 1971). It is certainly not clear that cases holding rent increases essentially unreviewable at the behest of tenants necessarily govern claims by owners in foreclosure proceedings. But, in any event, the case before us is not one where a defense based on denial of rent increases has met the arbitrary and capricious standard.

Defendant also states that it was denied an operating subsidy and that had it received this subsidy it could have met its expenses. Congress authorized the operating subsidy in the 1974 Housing Act. At first, the Secretary of HUD refused to implement the subsidy program. A class action suit was brought on behalf of low-income tenants. *See Underwood v. Hills*, 414 F.Supp. 526 (D.D.C.1976). The settlement of that suit concluded that Congress intended payments to *tenants* to be mandatory. In a later suit brought by project owners, *Battles Farm Co. v. Harris*, 703

F.2d 1292 (D.C.Cir.1983), the District of Columbia Circuit determined that owners were also entitled to subsidy payments when, during the period of the Secretary's inaction, they voluntarily held rents below the maximum allowed to be charged. The operating subsidy program was discontinued in 1978.

Here again, Prince Hall does not indicate what level of subsidy it expected to receive or show how this would have cured its default. The subsidy program was not authorized until 1975 yet Prince Hall has been in default since 1971. The subsidy program only lasted until 1978 yet Prince Hall remained in default through 1983. Prince Hall offers no proof that it satisfied the *Battles Farm* criteria. Nothing indicates that Prince Hall's tenants paid anything less than the maximum rent. Prince Hall does not even show that it applied for a subsidy while the program was in effect. HUD, then, cannot be blamed for Prince Hall's default and its failure to magically solve Prince Hall's financial woes cannot be said to constitute arbitrary and capricious conduct. The district court opinion is therefore AFFIRMED.